[Cite as *In re A.S.*, 2017-Ohio-8984.]

STATE OF OHIO      )  
               )ss:  
COUNTY OF SUMMIT   )  

IN RE: A.S.  
     I.S.  
     J.S.  
     A.S.  

IN THE COURT OF APPEALS  
NINTH JUDICIAL DISTRICT  

C.A. No.     28743  

APPEAL FROM JUDGMENT  
ENTERED IN THE  
COURT OF COMMON PLEAS  
COUNTY OF SUMMIT, OHIO  
CASE Nos.   DN 16-02-0107  
             DN 16-02-0108  
             DN 16-02-0109  
             DN 16-02-0110  

DECISION AND JOURNAL ENTRY

Dated: December 13, 2017

SCHAFER, Presiding Judge.

**{¶1}** Appellant-Father appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his minor children A.S., I.S., J.S., and Am.S., and placed the children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

**{¶2}** Father is the established biological father of A.S. (d.o.b. 5/30/09), I.S. (d.o.b. 10/27/12), J.S. (d.o.b. 10/31/13), and Am.S. (d.o.b. 1/27/16). The biological mother of all four children abandoned the children and is not a party to this appeal. Mother and Father have never been married but have apparently cohabited as domestic partners. There is a history of domestic violence between the parents, and Father was on probation for third degree felony domestic

violence against Mother during the proceedings. He was also subject to a temporary protection order and prohibited from having any contact with Mother.

{¶3} The family has had prior involvement with CSB. A.S. was twice before removed from her parents' care. She was adjudicated dependent in 2009, and dependent and neglected in 2010. In both prior cases, the child was reunified with her parents. CSB again became involved with the family in late 2015, after receiving an intake report after the police investigated another domestic violence incident between Mother and Father. When the police arrived, they found evidence of drugs in the home. Father was arrested for violating the temporary protection order issued in favor of Mother.

{¶4} CSB began to work informally with the family and instituted a voluntary case plan to provide for the safety, stability, and security of the children. When neither parent was able to demonstrate the ability to provide the necessary care to maintain the children in a safe, stable, and secure environment, the agency filed complaints alleging all four children to be dependent. After an adjudicatory hearing, the juvenile court found the children to be dependent and placed them in the temporary custody of CSB. The juvenile court adopted the agency's case plan as the order of the court. At first, Mother attempted to comply with case plan objectives, but she quickly ceased any involvement in the case. According to the magistrate's findings at periodic review hearings, Father's case plan compliance was sporadic.

{¶5} Nine months after the initiation of these cases, CSB filed a motion for permanent custody. The agency alleged that the first prong of the permanent custody test was satisfied because (1) Mother abandoned the children pursuant to R.C. 2151.414(B)(1)(b); and (2) A.S. was adjudicated an abused, neglected, or dependent child on three separate occasions; and I.S., J.S., and Am.S. were removed from the custody of parents where another child of the parents

(A.S.) had previously been adjudicated abused, neglected, or dependent on three separate occasions pursuant to R.C. 2151.414(B)(1)(e). The agency further alleged that permanent custody was in the best interest of the children. Almost six months later, Father filed a competing motion for legal custody, or alternatively, for a six-month extension of temporary custody.

{¶6} The children had been out of the parents' care for almost 18 months, when the juvenile court held the final dispositional hearing. The trial court granted CSB's motion for permanent custody and terminated Mother's and Father's parental rights. Father filed a timely appeal in which he raises one assignment of error for review.

## II.

### ASSIGNMENT OF ERROR

> THE TRIAL COURT'S DECISION TO GRANT CSB'S MOTION FOR PERMANENT CUSTODY WHILE DENYING FATHER'S MOTION FOR A SIX-MONTH EXTENSION IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶7} Father argues that the juvenile court's award of permanent custody to CSB, in lieu of a six-month extension of temporary custody, was against the manifest weight of the evidence. This Court disagrees.

{¶8} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the

evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶9} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 97-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶10} The juvenile court found that the first prong of the permanent custody test was satisfied because (1) Mother had abandoned the children (R.C. 2151.414(B)(1)(b)), and (2) A.S. had been adjudicated a dependent and/or neglected child on three separate occasions (R.C. 2151.414(B)(1)(e)). Father does not challenge these findings; rather, he solely challenges the finding that permanent custody was in the best interest of the children. Father moreover argues that a six-month extension of temporary custody was in the children's best interest.

{¶11} The decision to grant or deny an extension of temporary custody lies in the discretion of the juvenile court. *In re P.B.*, 9th Dist. Summit No. 23276, 2006-Ohio-5419, ¶ 36, citing R.C. 2151.415(D)(1) and (2). The juvenile court is authorized to exercise its discretion to

extend temporary custody only if it finds, by clear and convincing evidence, the following three things: "'(1) that such an extension is in the best interests of the child, (2) that there has been significant progress on the case plan, and (3) that there is reasonable cause to believe that the child will be reunified with a parent or otherwise permanently placed within the period of extension.'" *In re J.P.-M.*, 9th Dist. Summit Nos. 23694 and 23714, 2007-Ohio-5412, ¶ 12, quoting *In re P.B.* at ¶ 36. Before the juvenile court may grant either permanent custody or a six-month extension of temporary custody, it must conduct a best interest analysis. *In re S.D.*, 9th Dist. Lorain Nos. 15CA010864 and 15CA010867, 2016-Ohio-1493, ¶ 30. Accordingly, "[i]f permanent custody was in the children's best interests, the alternative disposition of extending temporary custody was not." *Id.*, citing *In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10; *see also In re N.M.*, 9th Dist. Summit No. 28118, 2016-Ohio-5212, ¶ 18.

{¶12} When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D)(1): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11.

Interaction and interrelationships of the children

{¶13} The first best interest factor requires the juvenile court to consider the "interaction and interrelationship of the child[ren] with the child[ren]'s parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child[ren.]" R.C. 2151.414(D)(1)(a).

{¶14} It is unclear how much involvement Father had in the children's lives prior to this case, given the ages of the three youngest children and the 2-year no contact order established in 2015. As to the oldest child, A.S. was earlier twice removed from her parents' custody. During the 18 months that this case was pending, Father was not consistent in visiting with the children. He missed multiple visits and was removed from the visitation schedule per agency protocol. After he requested that his visits be reinstated, CSB required him to call in to confirm each visit due to the children's placement in a foster home an hour away. Father missed some visits due to his failure to call the agency by the designated time to arrange for the children's transportation. The guardian ad litem reported that when Father did appear for visitation, he had difficulties addressing the needs of all four children at once. Although this improved slightly over time, Father still struggled to keep up with all four children during visitation. The guardian further reported that Father clearly loves his children and that they do share a bond.

{¶15} The four children were placed in the same foster home together. At first, A.S. assumed a caretaker role in relation to her younger siblings, but she became less vigilant as she acclimated to the security and stability in the foster home. The children enjoy a very close relationship with one another. Brothers I.S. and J.S. are particularly close given their closeness in ages. Am.S. enjoys imitating her older siblings and strives to keep up with them. All four children express affection for their foster family and one another. Although the foster family is not able to adopt the children, their placement in the foster home is secure until a permanent home can be found.

Wishes of the children

**{¶16}** The second best interest factor requires consideration of the "wishes of the child[ren], as expressed directly by the child[ren] or through the child[ren]'s guardian ad litem, with due regard for the maturity of the child[ren.]" R.C. 2151.414(D)(1)(b).

**{¶17}** The guardian ad litem reported that A.S. initially expressed a desire to live with Mother. After not seeing Mother for over a year, A.S. told the guardian that she wanted to live with Father. I.S., J.S., and Am.S. are too young to articulate their wishes. The guardian ad litem recommended permanent custody in the best interest of the children, and further recommended that the children not be separated from one another.

Custodial history of the children

**{¶18}** The third best interest factor requires consideration of the children's custodial history, including whether they have been in the temporary custody of CSB for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c).

**{¶19}** A.S. has been removed from her parents' custody on three separate occasions during her eight years of life. All of the children spent the past 18 months together in the same foster home. Because of the 2-year no contact order in effect between Mother and Father since 2015, Father would have had limited contact with the children during that time when they were in Mother's care.

The children's need for a legally secure permanent placement; less restrictive options

**{¶20}** The fourth best interest factor requires the juvenile court to consider the children's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)(d).

{¶21} Father has been involved with CSB on three separate occasions for a number of years. He also has a significant criminal history with regard to domestic violence convictions. Based on historic and ongoing issues, CSB crafted the following case plan objectives for Father: (1) obtain a substance abuse assessment, follow through with all treatment recommendations, and submit to weekly urine drug screens; (2) comply with the terms of his probation, including engaging in all court-ordered counseling; (3) complete parent education classes; (4) complete the Fame Fathers program; (5) obtain and maintain safe and stable housing, and demonstrate the ability to provide for the basic needs of the children; and (6) and establish paternity.

{¶22} Father's probation officer had been supervising Father for almost two years at the time of the hearing. The probation officer testified that he has seen some progress in the past two years, but that "as always," Father consistently fails to follow up on what he needs to do. Approximately 90 days before the hearing, the probation officer sent Father to a halfway house (Oriana) "to try to get him stable" to give Father a better chance at reunification with the children. Although Father tested positive for amphetamines a few times early in his placement, he did fairly well in the structured setting. Upon release from Oriana, however, Father began missing appointments with counselors and his probation officer, sometimes because he "forgot." The probation officer testified that his current concerns regarding Father include his ability to maintain sobriety; his inconsistency in attending treatment services; and his failure to obtain housing, which was a problem the "whole time."

{¶23} The psychological assistant who conducted Father's parenting evaluation testified that Father failed to appear for his first two scheduled appointments in October and November 2016. Father only submitted to a parenting evaluation about a month before the hearing. He dropped in unannounced at Summit Psychological Associates without an appointment, and by

sheer happenstance the evaluator was able to see him that day. Father continues to minimalize the impact that his substance abuse issues have had on his life. In addition, he denies culpability for any domestic violence and blames Mother for creating those violent encounters. The caseworker, too, testified that Father refuses to take responsibility for the issues that led to the removal of the children in this case, and in the prior two cases. She noted that Father denies that he has a drug problem or any issue with domestic violence, despite three convictions.

{¶24} Father's parenting evaluation gave rise to diagnoses of a substance abuse related disorder relative to alcohol, cannabis, and amphetamines; an other-specified personality disorder with antisocial traits; and bipolar disorder. He presents with maladaptive traits that interfere with his ability to maintain healthy relationships. The evaluator opined that Father has "very little insight into his situation" and "lack[s] significant parenting knowledge." Based on Father's dismissive attitude regarding his mental health and substance abuse issues, the evaluator testified that it is unlikely that Father would take any treatment services seriously.

{¶25} The caseworker testified that Father has been very inconsistent in his attempts to comply with his case plan objectives. Of significant concern was Father's lack of effort to address his substance abuse issues. After submitting to a substance abuse assessment, Father was terminated from intensive outpatient treatment at Community Health Center due to numerous missed appointments. From mid-May 2016 until January 2017, Father submitted only seven of his required weekly urine screens. In five of those screens, he tested positive for amphetamines. The case worker testified that the agency presumes that a client's failure to submit to a drug screen indicates that the screen would have been positive. Since his release from Oriana on June 8, 2017, Father submitted one urine screen, which was negative; but he

failed to submit any additional samples prior to the hearing at the end of July 2017. Moreover, Father has failed to identify any individuals in his life who could provide sobriety support.

{¶26} Although Father completed the Fame Fathers program (a support group, rather than parenting instruction), Father failed to engage in any parenting classes. The caseworker first referred Father for parenting classes in February 2016, at Summit Psychological Associates, and later at Greenleaf. At the end of June 2017, Father was finally scheduled to begin parenting education at Summit Psychological, but he failed to appear for that appointment. By the time of the hearing, Father had missed four classes. The caseworker testified that parenting education was a critical component of Father's case plan; because these are four young children at different developmental stages, and the caseworker observed deficiencies in Father's ability to supervise and interact with the children during visits.

{¶27} Also of critical significance was Father's failure to obtain safe and stable housing. The caseworker testified that Father's housing situation had been unstable throughout A.S.' whole life. The probation officer echoed that housing was consistently an issue for Father during the past two years. At the time of the hearing, Father was living with his aunt in a home that the probation officer described as chaotic. In addition, one of the inhabitants of that home used drugs, presenting an untenable situation for Father's sobriety and the children's safety. Father admitted to his probation officer that his current living arrangements were not appropriate for the children. Although Father received housing referrals from both Oriana and the CSB caseworker, he failed to pursue any of those options.

{¶28} Both the caseworker and guardian ad litem testified that the children require permanency in their lives and that there is no option for permanency short of permanent custody, given (1) Mother's abandonment of the children, (2) Father's lack of progress on his case plan

objectives and inability to demonstrate that he could provide a safe and stable home environment, and (3) no viable relative or third-party placements. The children have experienced stability in the foster home for 18 months. Although it is not a foster-to-adopt home, the guardian reported that the children could remain in that placement together until a suitable adoptive home was found.

Applicability of R.C. 2151.414(E)(7)-(11) factors

{¶29} Mother abandoned the children pursuant to R.C. 2151.414(E)(10). No R.C.2151.414(E)(7)-(11) factor applies to Father.

Conclusion

{¶30} The record demonstrates that this is not a case where the juvenile court clearly lost its way and created a manifest miscarriage of justice in finding that it was in the best interest of the children to be placed in the permanent custody of CSB. *See Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20. There is an abundance of clear and convincing evidence to demonstrate that Father had not only failed to address and overcome his substance abuse issues, but he continued to deny that amphetamine abuse was even an issue for him. Moreover, he denied any issues involving domestic violence despite three convictions. The only time that Father managed to demonstrate any consistency in either addressing various issues or visiting the children was when he was in a highly structured setting like a halfway house. Without structured supervision and forced accountability, Father lost motivation and failed to appear for probation and treatment appointments, required classes, and visitations. As a result, Father was never able to demonstrate that he had attained any insight to address the issues which prevented him from providing for the basic needs of the children. Under these circumstances, the children would be exposed to insecurity, instability, and potential harm were they to be returned to Father's care.

Accordingly, the evidence supported the juvenile court's finding that permanent custody was in the best interest of the children. Therefore, the juvenile court's termination of Father's parental rights and award of permanent custody were not against the manifest weight of the evidence.

{¶31} Because this Court concludes that an award of permanent custody of A.S., I.S., J.S., and Am.S. to CSB was in the children's best interest, a six-month extension of temporary custody was contrary to the children's best interest. *See In re S.D.*, 2016-Ohio-1493, at ¶ 30. Moreover, Father failed to make significant progress on his case plan, and there was no reasonable cause to believe that the children could have been reunified with Father in the limited time remaining for a first six-month extension of temporary custody. Father's assignment of error is overruled.

## III.

{¶32} Father's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

CARR, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

JACLYN PALUMBO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.